## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JARED HESTER,

     Plaintiff,

     v.

BOARD OF EDUCATION OF PRINCE
GEORGE'S COUNTY,

     Defendant.

Civil Action No. TDC-22-0128

### MEMORANDUM OPINION

Plaintiff Jared Hester, a former school teacher with the Prince George's County Public Schools ("PGCPS") in Maryland, has filed suit against Defendant Board of Education of Prince George's County ("the BOE"), alleging employment discrimination based on sex, religion, race, and national origin, as well as unlawful retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2018). Pending before the Court is the BOE's Motion to Dismiss. The Motion is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

### BACKGROUND

Jared Hester, a gay Black man who is Jewish, was employed as a teacher within the PGCPS from July 2016 to June 2018. During this time, Hester served as a Spanish teacher at the Chesapeake Math and IT ("CMIT") Academy High School and the CMIT Academy Middle School in Laurel, Maryland. Hester alleges that, during the time he was employed with PGCPS,

he was subjected to a hostile work environment on the basis of sex, religion, race, and national origin.

## I.   Sexual Harassment

Hester primarily alleges that he was subjected to sex-based harassment. Hester asserts that students and parents regularly harassed, bullied, and made fun of him because of his sexual orientation. On two occasions, parents of students participated in this bullying. Specifically, students consistently misgendered Hester, regularly referring to him as "miss," "her," and "she" and calling him derogatory slurs such as "faggot." Am. Compl. Ex. 5 at 25, ECF No. 24-5. On another occasion, a student called her mother during Hester's class and told her, "I am in Mr. Hester's class . . . yeah, the gay one." *Id.* at 30.

Hester also alleges that he was subjected to threats and physical violence relating to his sexual orientation. Between January and February 2018, a student posted a photograph of a gun and a death threat, which stated that the student intended to kill the gay, Jewish teachers at the school, of which Hester was one of two. The parties agree that in response, the school suspended the student for one or two weeks, but the student was then returned to Hester's classroom, and Hester had to continue to teach this student for the remainder of the academic year. In March or April 2018, a student assaulted Hester by ramming his shoulder into Hester's back. Although Hester filed a formal disciplinary report about this incident, no action was taken because there was no video evidence of the assault.

Hester also alleges that Andrew Brauer, the former Assistant Principal and current Principal of CMIT Middle School and Hester's supervisor, consistently mocked Hester's sexual orientation and verbally and physically harassed him because of his sexual orientation. In March 2017, Brauer yelled at Hester "within a few inches" of his face and within earshot of his students.

2

Am. Compl. at 2, ECF No. 24. Hester informed Brauer that his conduct made Hester feel "intimidated" and "scared." Am. Compl. Ex. 5 at 25. Nevertheless, Brauer yelled at Hester in the same way in August or September 2017, in front of colleagues. After Hester reported the second incident on an anonymous hotline and referenced that he was gay and a member of an ethnic minority group, Brauer began to engage in other forms of harassment, including grabbing Hester's sleeve and cupping his hand against Hester's ear and whispering insults. Hester alleges that Brauer escalated his mistreatment of Hester after his gender presentation became more feminine. Although Hester reported the harassment to Brauer's supervisor and stated that he did not feel safe at CMIT Middle School as an LGBT individual, he was just told that he had no reason to feel unsafe.

When Hester complained to the District Supervisor, Brauer's harassment stopped for a period of time. However, it resumed in March 2018. Brauer's actions included staring Hester down in an intimidating manner, hovering over him, stalking Hester outside of school property, and growling and baring his teeth at Hester. On one occasion, between March and June 2018, during a private meeting between Hester and Brauer in which they discussed the oral part of a language exam, Brauer paused, smiled, and said the word "oral" in a sexually suggestive way. *Id.* at 27. In May 2018, when Hester complained about the harassment by students, Brauer just stated, "What you do on your own time is none of our business." Am. Compl. at 3.

## II. Other Harassment

Hester also alleges that he was subjected to harassment based on his religion, based in part on the student threat to kill the gay, Jewish teachers and the allegedly inadequate response by PGCPS. In addition, Hester alleges that during the 2016-2017 school year, another teacher, Joseph Gruber, asked Hester if he was Christian. After Hester informed Gruber that he was Jewish,

3

Gruber asked Hester about his thoughts on Jesus and later invited him and another teacher to a Bible study. After he declined the invitation, the second teacher asked Hester if he was Christian and noted that she was Christian and attended church on Sundays. On another occasion, in April 2018, Brauer referenced the "sanctity of education," which Hester perceived as a comment related to Christianity. Am. Compl. Ex. 5 at 17.

Hester further alleges that he was subjected to race-based harassment. Generally, Hester alleges that Brauer made various statements and inferences about his race, ethnicity, and national origin. As for specific incidents, Hester alleges that, in February 2018, he filed a complaint of workplace harassment with the Office of Equity Assurance. During his conversation with Amana Simmons, an employee in that office, Hester mentioned that he was Black. In response, Simmons "cocked her head to the side" and stared at Hester "with a look suggesting that she was confused." Am. Compl. at 3. Hester also asserts that in March 2018, Brauer referenced Hester's "ethnic background" during a performance evaluation and gave Hester a lower score on his performance evaluation because of Hester's ethnic background or his "misperception" of it. *Id.* at 2. That same month, a colleague revealed to Hester that Brauer's wife is Black by stating to Hester, "Black teachers are really strict . . . Especially Black women . . . Mr. Brauer's wife is Black, yeah, and I've heard she's really strict." Am. Compl. Ex. 5 at 27. Hester alleges that this statement was orchestrated by Brauer to demonstrate that he would not engage in race discrimination. In June 2018, when Hester asked for leave to attend a wedding in Mexico, Brauer asked Hester if his family was from Mexico.

## III.    Retaliation

Finally, Hester alleges retaliation against him for reporting the harassment.    In approximately September 2017, Hester reported Brauer's conduct to Mehmet Grunes, Brauer's

supervisor and the Principal of CMIT Academy High School, and stated that he felt unsafe at the school as a member of the LGBT community. Around the same time, Hester submitted an anonymous complaint about the harassment through a hotline. In November 2017, Hester was put on a performance improvement plan. Among the concerns raised about Hester's performance during the 2016-2017 school year were low student growth scores, failure to attend certain meetings, tardiness, and the failure to submit certain weekly lesson plans on time. In November 2017, Hester escalated his complaint to the District Supervisor for PGCPS.

In December 2017, Hester resigned from his position with PGCPS, but shortly thereafter he requested to rescind the resignation. PGCPS granted this request. In February 2018, Hester filed his formal complaint with the PGCPS Office of Equity Assurance, which ultimately found that no harassment had occurred. On June 30, 2018, PGCPS terminated Hester's employment. The termination letter asserted that Hester's employment was terminated because of the expiration of Hester's teaching certificate. On July 15, 2018, prior to receiving PGCPS's June 30 letter, Hester submitted his resignation to PGCPS.

## IV.    Procedural History

On October 30, 2018, Hester filed a charge of discrimination ("the EEOC Charge") with the United States Equal Employment Opportunity Commission ("EEOC"). In November 2021, the EEOC issued to Hester a Notice of the Right to Sue. On January 14, 2022, Hester filed his initial Complaint in this action.

## DISCUSSION

In its Motion, the BOE seeks dismissal (1) pursuant to Federal Rule of Civil Procedure 8(a) because Hester has violated the requirement that a complaint consist of a "short and plain statement

5

of the claim," Fed. R. Civ. P. 8(a)(2); and (2) pursuant to Rule 12(b)(6) because Hester has failed

to allege sufficient facts to support a plausible claim for relief on any of his claims.

**I.      Rule 8**

The BOE first argues that the Court should dismiss the Amended Complaint because it

violates the requirement of Rule 8 that a complaint consist of a "short and plain statement of the

claim showing that the pleader is entitled to relief." Fed. R. Civ. P.  8(a)(2). The BOE is correct

that the Amended Complaint does not comply with this requirement.  Although the main body of

the Amended Complaint consists of a five-page pleading that standing alone is a "short and plain

statement," *id.*, Hester specifically states in the Amended Complaint that:

> This amendment is not meant to erase or overwrite any aspect of any of those
> previous documents.  My complaint is a living body of documents and that must be
> analyzed in whole.  Therefore, any event or action that is not elaborated upon in
> this amendment is not an implication of removal or erasure of actions and events
> from the full body of documents which constitutes the complaint.
>
> The Defense should do its best to review all documents submitted with the
> complaint and consider them as a whole . . .

Am. Compl. at 1.  By seeking to incorporate a broad array of other documents, which consists of

the original Complaint and 60 pages of exhibits that include a disparate set of documents without

any explanation of how they state a claim for relief, the Court finds that Hester has not provided a

"short and plain statement" of his claims. Fed. R. Civ. P. 8(a)(2).  Notably, his unilateral assertion

that his Amended Complaint "is not meant to erase or overwrite," the original Complaint, Am.

Compl. at 1, is inconsistent with the general requirement that an amended complaint must fully

restate all allegations. *Young v. City of Mt. Rainier*, 238 F.3d 567, 572 (4th Cir. 2001) (quoting

*Crysen/Montenay Energy Co. v. Shell Oil Co.*, 226 F.3d 160, 162 (2d Cir. 2000)).  Moreover, it

directly violates Local Rule 103.6(c), which provides that an amended complaint must be

accompanied by a copy "in which stricken material has been lined through or enclosed in brackets

6

and new material has been underlined or set forth in bold-faced type," which plainly contemplates that an amended complaint fully replaces previously filed pleadings.   D. Md. Local R. 103.6(c). Indeed, Hester's approach of unilaterally declaring his Amended Complaint to be a "living body of documents that must be analyzed as whole," Am. Compl. at 1, reflects a distinct lack of courtesy to the Court, as it effectively insists that the Court, not Hester, wade through his sprawling compilation of disparate documents attached to the Amended Complaint to identify his claims and the supporting facts.

Nevertheless, because Hester is self-represented and likely unfamiliar with the Court's requirements, the Court will not dismiss the Amended Complaint for non-compliance with Rule 8.  The Court is also mindful of the fact that while arguing that the Amended Complaint is not "short and plain," the BOE simultaneously argues, like most defendants since *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), that Hester has not alleged sufficient facts to avoid dismissal, such that a plaintiff could reasonably be reluctant to file a short complaint without including all possibly relevant details.  The Court will therefore deny the Motion as to the Rule 8(a) argument, but it cautions Hester that all additional filings must comply with all requirements of the Federal Rules of Civil Procedure and the Local Rules.

## II.    Rule 12(b)(6)

In seeking dismissal under Rule 12(b)(6), the BOE argues that (1) claims originating before January 3, 2018 are time-barred; (2) the retaliation claim should be dismissed based on a failure to exhaust administrative remedies; (3) Hester has not pleaded sufficient facts to support a claim that the harassment against him was sufficiently severe or pervasive as to create a hostile work environment; (4) Hester has not pleaded sufficient facts to support a claim that the harassment was

based on sex, religion, race, or national origin; and (5) Hester has not pleaded sufficient facts to support a claim of retaliation.

## A.     Legal Standard

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

## B.     Limitations Period

The BOE argues that the Court should dismiss all claims arising before January 3, 2018, or 300 days before the filing of the original Complaint, as untimely. Under Title VII, a plaintiff must file an employment discrimination charge with the EEOC either 180 or 300 days after an "alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). The limitations period is 300 days in a "deferral state," a state "in which state law proscribes the alleged employment practice and the charge has initially been filed with a state deferral agency." *Prelich v. Med. Res., Inc.*, 813 F. Supp. 2d 654, 661 (D. Md. 2011). Maryland is a deferral state, and Maryland's "deferral agency, the Maryland Commission on Human Relations ('MCHR'), has a work-sharing agreement with the EEOC whereby a claim filed before one commission is effectively filed before both." *Valderrama v. Honeywell Tech. Sol., Inc.*, 473 F. Supp. 2d 658, 662 n.4 (D. Md. 2007); *see* 29 C.F.R. § 1601.74 (designating MCHR as a Fair Employment Practices

8

agency). Thus, in Maryland, a complainant has 300 days in which to file a charge of discrimination under Title VII, and claims based on an action occurring outside of that 300-day period cannot be brought as part of the federal case. *See Valderrama*, 473 F. Supp. 2d at 662 n.4.

Hostile work environment claims, however, are different from discrimination claims based on discrete acts in that they involve "repeated conduct," such that the unlawful employment practice "occurs over a series of days or perhaps years." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Thus, in applying the limitations period, the Court may consider the "entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period," so long as one act "contributing to that hostile work environment takes place within the statutory time period." *Id.* at 105.

Hester alleges that the harassment occurred between March 2017 and June 2018. Notably, he asserts that several acts of harassment occurred after January 3, 2018, including an incident in which a student made a death threat against Hester, which occurred in January or February 2018; an incident in which a student forcefully pushed Hester, which occurred in March or April 2018; an incident in which Brauer said the word "oral" to Hester in a sexually suggestive manner, which occurred between March and June 2018; and incidents in which students called Hester homophobic slurs, which occurred continuously throughout the school year. Each of these incidents arguably contributed to the hostile work environment, so that any one provides a basis to conclude that the hostile work environment claims are timely, and, under the continuing violation doctrine, the Court may consider the entire course of harassment in adjudicating those claims. *See id.* at 115.

The BOE further argues that the Court may not consider the pre-January 2018 events because as alleged in the Amended Complaint, there was a break in the harassment between December and March 2018, in part because of Hester's temporary resignation in December 2018,

9

which he later rescinded.  Generally, however, a break in events of only a few months does not prevent a plaintiff from relying on the continuing violation doctrine.  *See Selan v. Kiley*, 969 F.2d 560, 566–67 (7th Cir. 1992) (finding that a plaintiff could not rely on the continuing violation doctrine for claims occurring outside of the filing window in part because there was a two-year gap between the incidents); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998) (finding that a plaintiff could not rely on the continuing violation doctrine for claims occurring outside of the filing window because there were several breaks in the harassment, including gaps of ten months, one year, and three years).  At a minimum, whether events before and after the break in harassment are sufficiently connected as to support application of the continuing violation doctrine requires an analysis of the facts, which is premature at the pleading stage.  *See Selan*, 969 F.2d at 566–67 (considering the question at the summary judgment stage).  The Court will therefore deny the Motion as to the argument that the hostile work environment claims are time-barred.  However, claims of retaliation are not subject to the continuing violation doctrine.  *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 209 n.5 (4th Cir. 2019)  ("Unlike claims for disparate treatment and retaliation, the continuing violation doctrine applies to a hostile work environment claim.").  Thus, any retaliation claims based on retaliatory acts occurring before January 3, 2018 are time-barred.

## C.     Exhaustion of Administrative Remedies

The BOE next argues that the Court should dismiss the claim of retaliation based on the termination of Hester's employment in June 2018 because Hester provided a different rationale for his retaliation claim in the EEOC Charge.  Generally, the "EEOC charge defines the scope of the plaintiff's right to institute a civil suit." *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002).  The EEOC charge must contain allegations "sufficiently precise to identify the parties,

and to describe generally the action or practices complained of." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 508 (4th Cir. 2005) (quoting 29 C.F.R. § 1601.12(b) (2004)).  If the claims asserted in a civil action "exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred." *Id.* at 509.

Here, Hester expressly stated on his EEOC Charge that he experienced retaliation by checking the box for retaliation and asserting that "I believe I have been . . . retaliated against for engaging in protected activity with respect to discipline."  EEOC Charge at 1–2, Opp'n Mot. Dismiss Ex. 2, ECF No. 28-2.  Though Hester specifically referenced only "write-ups for lateness" as a form of discipline imposed upon him, and did not reference his termination, *id.*, a retaliatory termination falls within this general description of retaliation "with respect to discipline," and a claim of retaliatory termination occurring only a few months after the discipline for tardiness would "naturally have arisen from an investigation" of the retaliatory discipline claim.  *See Chacko*, 429 F.3d at 509.  Thus, Hester has sufficiently exhausted administrative remedies relating to the retaliation claim based on his termination, and the Motion will be denied as to this issue.

### D.   Hostile Work Environment

On the merits, the BOE argues that the Amended Complaint fails to state a plausible claim of a hostile work environment based on sex, religion, race, or national origin.  A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015).  To prove such a claim, a plaintiff must show that (1) the plaintiff experienced unwelcome conduct; (2) the conduct was based on the plaintiff's race, color, national origin, religion, age, or sex; (3) the conduct was sufficiently severe or pervasive to alter the conditions of

11

employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability

on the employer. *Baqir v. Principi*, 434 F.3d 733, 745–46 (4th Cir. 2006). Here, there is no dispute

that Hester experienced "unwelcome conduct" sufficient to establish the first element of a hostile

work environment. *See Strothers v. City of Laurel*, 895 F.3d 317, 328–29 (4th Cir. 2018) (stating

that this prong "is not a high hurdle" and can be established by an employee's voicing of an

"objection to the alleged harasser or to the employer"). The Court will address the remaining three

elements.

### 1.    Severe or Pervasive

The BOE asserts that the allegations do not describe conduct sufficiently "severe or

pervasive as to alter the conditions of [Hester's] employment and create an abusive or hostile

atmosphere." *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). This element

has both subjective and objective components. *Id.* As to the subjective component, the plaintiff

must have subjectively perceived the environment to be hostile or abusive. *Id.* Here, Hester

repeatedly alerted PGCPS administrators to the harassment and how it was affecting his work and

has thus satisfied this requirement. *See id.* at 176 (finding that a plaintiff's emotional distress and

complaints to supervisors met the subjective component).

In assessing whether the environment "was objectively severe or pervasive," courts "must

look at all the circumstances, including the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance." *Id.* (quoting *EEOC v. Sunbelt

Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)); *see also Mosby-Grant v. City of Hagerstown*,

630 F.3d 326, 335 (4th Cir. 2010). No "single factor is dispositive" because the "real social impact

of workplace behavior often depends on a constellation of surrounding circumstances,

expectations, and relationships." *Cent. Wholesalers, Inc.*, 573 F.3d at 176 (internal citations omitted).

Here, Hester has alleged that during the two school years that he worked for PGCPS, he was continually harassed by students, parents, and his supervisor. Hester was repeatedly misgendered, including being deliberately referred to as "she," "her," and "miss," and he was frequently called a "faggot." Furthermore, students consistently taunted, bullied, and harassed Hester for being gay. On two occasions, parents participated in this harassment. While the BOE asserts that this conduct constitutes "simple teasing," *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), as the United States Court of Appeals for the Fourth Circuit has recognized in finding harassment sufficiently severe and pervasive to constitute a hostile work environment, "[n]ames can hurt as much as sticks and stones." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 318 (4th Cir. 2008); *see also Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995) (finding that a reasonable person could "easily" find an atmosphere hostile where the plaintiff's supervisor called him discriminatory names "almost daily" and engaged in other facially neutral harassing behavior, including "intentionally [trying] to embarrass him"); *Boyer-Liberto*, 786 F.3d at 280–81 (holding that the use of a severe racial slur on two occasions could be sufficient to establish a severe or pervasive hostile work environment).

Moreover, the harassment from students also included physical attacks and threats. On one occasion, a student physically assaulted Hester by ramming his shoulder into Hester's back. On another, a student posted a photograph of a gun and threatened to kill the gay, Jewish teachers, of which Hester was one. *See Pryor v. Am. Airlines*, 791 F.3d 488, 496 (4th Cir. 2015) (finding that racist death threats alone were sufficiently severe as to alter the conditions of the plaintiff's employment and create a hostile work environment).

Beyond the harassment by students and parents, Hester also faced numerous incidents of harassment by his supervisor, Brauer, who mocked Hester's sexual orientation, yelled at him within inches of his face on at least two occasions, grabbed him by the sleeve, stalked Hester outside of school property, growled and bared his teeth at Hester, whispered insults into his ear, and used the word "oral" in a sexually suggestive way. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 243 (4th Cir. 2000) (finding that genuine issues of material fact existed as to whether a supervisor's ongoing harassment, which consisted of repeated belittling remarks based on the plaintiff's gender, was sufficiently severe and pervasive to create a hostile work environment).

Finally, Hester has alleged that the ongoing harassment had a significant impact on him. In the midst of the harassment, he reported it to the principal of his school and stated that he "did not feel safe working at CMIT Academy North as a member of the LGBT community." Am. Compl. at 2. Hester was diagnosed with and treated for anxiety and post-traumatic stress disorder as a result of the harassment. Such allegations bolster the claim that the harassment was sufficiently severe and pervasive as to alter the terms and conditions of employment and create an abusive atmosphere. *See Harris v. Forklift Sys.*, 510 U.S. 17, 22–23 (1993) (holding that Title VII bars harassing conduct "that would seriously affect a reasonable person's well-being" while also concluding that evidence of "concrete psychological harm" is not necessary to establish a hostile work environment); *see also Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 199 (4th Cir. 2000) (evaluating the psychological harm of the harassing conduct in determining whether the conduct is sufficiently severe and pervasive that the plaintiff perceived it to be subjectively hostile). *Allen v. TV One, LLC*, No. DKC-15-1960, 2017 WL 4404408, *8 (D. Md. October 4, 2017) (finding that the harassing conduct was sufficiently severe or pervasive in part because the plaintiff received mental health treatment to cope with depression resulting from the conduct).

14

Taken together, the allegations of consistent and unrelenting harassment by students, which included a physical assault and a death threat, combined with the allegations of ongoing harassment by Brauer, establish a sufficient basis to support a claim of a severe and pervasive hostile work environment.

### 2.    Because of Sex

As for the requirement that the harassment was "because of" sex, religion, race, or national origin, 42 U.S.C. § 2000e-2(a), the BOE does not put forth any specific argument as to why the harassment of Hester was not based on sex.  The United States Supreme Court has held that discrimination based on sexual orientation is a form of unlawful sex discrimination under Title VII because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," because "homosexuality and transgender status are inextricably bound up with sex." *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741–42 (2020). Here, where Hester alleges that students consistently misgendered him, called him derogatory slurs such as "faggot," and on one occasion threatened to kill him because he was gay, there is no question that the harassment was because of sex. *See id.* at 1741.  Viewed in the light most favorable to Hester, as is required at this stage, the allegations that Brauer used the word "oral" in a sexually suggestive way, escalated his mistreatment of Hester after his gender presentation became more feminine, and brushed off Hester's complaints of sexual harassment against him because he is gay with the statement, "What you do on your own time is none of our business," Am. Compl. at 3, could be construed as conveying a discriminatory animus based on sexual orientation.  In light of these allegations, it is also fair to consider the other incidents of harassment by the same individuals or groups—including the physical assault by a student on Hester and Brauer's yelling, grabbing, and whispering at Hester—as perpetrated "because of sex,"

even if they were not accompanied by overt derogatory statements about Hester's sexual orientation, as harassment "need not be accompanied by a contemporaneous statement of animus . . . rather, the connection between animus and conduct may be inferred from the totality of the circumstances." *See Strothers*, 895 F.3d at 324–25, 330–31 (finding that the plaintiff's supervisor's conduct—which included marking the plaintiff as late even though her arrival time was preapproved, tracking and faulting each of the plaintiff's absences from her desk, and publicly confronting the plaintiff about her dress even though it conformed with the dress code—was based on race even though the supervisor had refrained from explicitly referencing the plaintiff's race or using racial slurs). Hester has therefore plainly alleged sufficient facts to support a claim that the hostile work environment was based on sex.

### 3.     Because of Religion

On the issue of whether there was a hostile work environment based on religious discrimination, the allegations are limited. Hester's allegation that a fellow teacher invited Hester to join his Bible study even after learning that Hester was Jewish, while troubling, is not sufficient to demonstrate severe and pervasive harassment based on religion. Likewise, Brauer's reference to the "sanctity" of education does not support such a claim. Am. Compl. Ex. 5 at 17. Notably, Hester does not argue that any of the incidents of harassment by students or parents was connected to religion except for one: the student threat in January or February 2018 to kill the gay, Jewish teachers.

The Fourth Circuit has affirmed a determination that two racist death threats delivered to the plaintiff, a United Airlines flight attendant, were sufficient to establish a hostile work environment based on race. *Pryor*, 791 F.3d at 496. However, in *Pryor*, the court relied in part on the specific language of the threats, which included the use of a severe racial slur and a reference

to hunting Black people, as well as the surrounding context, which included similar threats made against other employees, racist messages written on flyers of which the plaintiff was aware, and racially-tinged rumors of prostitution involving Black flight attendants. *Id.* at 496–97. Here, the circumstances are not comparable to those in *Pryor*, as there were no other incidents involving "discriminatory intimidation, ridicule, and insult" based on religion. *Boyer-Liberto*, 786 F.3d at 277. The Fourth Circuit has held that a single incident, if sufficiently severe, can support a finding of a hostile work environment, but in doing so, it further stated that "[i]n measuring the severity of harassing conduct, the status of the harasser may be a significant factor" because "a supervisor's power and authority invests [the] harassing conduct with a particular threatening character." *See Boyer-Liberto*, 786 F.3d at 280 (finding that the use of the highly derogatory racial slur "porch monkey" on two occasions, even if viewed as a single incident, was sufficient to support a finding of a hostile work environment). While in *Boyer-Liberto* the perpetrator was a more senior employee closely aligned with the owner, here, the threat was made by a student who was not employed by PGCPS and was entirely unaffiliated with the supervisory structure. *See id.* at 278. Even viewing the allegations in the light most favorable to Hester, the Court does not find that this particular single incident is sufficient to support a claim that the hostile work environment was based on religion. As discussed above, the incident is still highly relevant to the claim of a hostile work environment based on sex.

### 4.     Because of Race or National Origin

Although Hester also alleges that the hostile work environment was based in part on race and national origin, he does not allege that any of the harassment by students or parents was based on race or national origin discrimination. He does not allege any statements by anyone that were explicitly racially derogatory. Rather, Hester bases his claim on (1) his conclusory assertion,

17

without additional factual support, that Brauer gave him a low performance evaluation score in March 2018 because of his race, where Brauer stated during the evaluation meeting that he did not know Hester's ethnicity; (2) the fact that a co-worker mentioned to him that Brauer's wife is Black, which Hester asserts was an attempt to demonstrate that Brauer would not engage in race discrimination; (3) the fact that Brauer spoke harshly to, and purposely used poor English with, a teacher of Turkish national origin; (4) the fact that, while signing a form to allow Hester to travel to Mexico for a wedding, Brauer asked him if his family was from Mexico; and (5) the fact that Amana Simmons, the PGCPS official who received his formal complaint submitted to the Office of Equity Assurance, appeared surprised when he stated that he is Black.

Even viewing the allegations in the light most favorable to Hester, these incidents lack the "discriminatory intimidation, ridicule, and insult" against Hester that typically characterize conduct underlying a hostile work environment, *see Boyer-Liberto*, 786 F.3d at 277, and they are not sufficient to support an inference that any of the individuals alleged to have harassed Hester— consisting of Brauer and the various students and parents—acted out of discriminatory animus based on race or national origin. The Court therefore concludes that the Complaint does not sufficiently allege facts supporting the conclusion that the alleged hostile work environment was based on race or national origin discrimination.

### 5.  Basis for Imposing Liability

The final element is that the harassment must be imputable to the employer. Under Title VII, liability may be imputed to an employer in several circumstances. First, if the harasser is a supervisor, the employer is strictly liable if the supervisor's actions culminated in a tangible employment action. *Strothers*, 895 F.3d at 333 n.6 (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 429–30 (2013)). A supervisor is someone empowered to "effect a significant change in

employment status," such as firing, failing to promote, or "a decision causing a significant change in benefits." *Id.* Second, if the harasser is the victim's co-worker, the employer may be held liable if it "knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333–34 (4th Cir. 2003) (en banc). Third, "[s]imilar to the reasoning [] set forth for employer liability for co-worker harassment," an employer can be held liable for harassment of an employee by non-employee third parties when "the employer knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment." *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 416, 422–23 (4th Cir. 2014) (applying this standard to harassment of a tile company employee by an independent sales representative for another company that did business with the tile company). This "negligence standard" applies to third-party harassment because an employer may not avoid Title VII liability for third-party harassment by "adopting a 'see no evil, hear no evil' strategy." *Id.* (quoting *Ocheltree*, 335 F.3d at 334).

Where Brauer was Hester's direct supervisor during Hester's employment, the BOE is liable for Brauer's conduct. *See Strothers*, 895 F.3d at 333. As to the harassment by students, the BOE does not contest that PCGPS management knew about it. Indeed, Hester reported this harassment to Brauer; James Screven, an assistant principal; and the PGCPS District Supervisor; and he filed a formal complaint with the PGCPS Office of Equity Assurance. In the spring of 2018, Hester reported to Brauer and Screven that students were harassing, taunting, and bullying him for being gay. In response, Brauer said, "What you do on your own time is none of our business," and dismissed Hester's complaint. Am. Compl. at 3. In the same time frame, Hester filed a formal disciplinary report against the student who assaulted him, but no action was taken.

There is no claim or evidence that the BOE took affirmative steps to address the verbal harassment and taunting.

The only incident of student harassment for which PGCPS took specific steps was the death threat. Whether an employer may be held liable for co-worker or third-party harassment depends on whether it responded with remedial action reasonably calculated to end the harassment. *Pryor*, 791 F.3d at 498. Whether an employer's response was proportional must be viewed in light of the nature of the harassment and requires an examination of the promptness of any investigation, the specific remedial measures taken, and the effectiveness of those measures. *Id.* Here, PGCPS responded to the very serious conduct by suspending the student for one or two weeks, and no further incidents relating to this student have been identified. However, following the suspension, the student was returned to Hester's class, and Hester was required to remain in the classroom and teach the student for the remainder of the academic year. At this early stage, before discovery, it is premature to determine whether the PGCPS's response was sufficiently reasonable to absolve it of liability for this incident. Particularly where it offered no response at all to most of the student harassment reported by Hester, the Court finds sufficient allegations to support a plausible claim that the BOE can be held liable for such harassment.

Hester has therefore alleged a plausible hostile work environment claim based on sex under Title VII.

### E.    Retaliation

The BOE also seeks dismissal of the retaliation claim under Rule 12(b)(6). Under Title VII, it is unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3. A Title VII retaliation claim may be established through direct evidence of retaliatory intent or

through a burden-shifting framework. *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (internal citations omitted). A plaintiff bears the initial burden of establishing a *prima facie* case of retaliation. *Id.* Once this burden is carried, the burden shifts to the defendant, who is obliged to articulate a legitimate, non-retaliatory justification for the adverse employment action. *Id.* If the defendant carries this burden, the onus is on the plaintiff to then demonstrate that the non-retaliatory reason advanced by the defendant is a mere pretext. *Id.* To establish a *prima facie* case of retaliation, a plaintiff must present facts that establish that (1) the plaintiff engaged in a protected activity; (2) the employer took a materially adverse action against the plaintiff; and (3) there was a causal link between the two events. *Boyer-Liberto*, 786 F.3d at 281. The BOE primarily argues that Hester has failed to allege sufficiently the third element, causation.

### 1. Protected Activity

There is no serious dispute that Hester engaged in protected activity. "Protected activity" consists of "oppos[ing] any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-3. Such employment practices include those that discriminate against employees with respect to their "terms, conditions, or privileges of employment" on the basis of race, color, religion, sex, or national origin. *See id.* § 2000e-2. Courts take an "expansive view of what constitutes oppositional conduct." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015). Protected activity "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). Here, Hester has alleged that he repeatedly voiced complaints to school administrators about discrimination and harassment by students, parents, and Brauer. In particular, in February 2018, he filed a formal complaint with the PGCPS Office of Equity Assurance. Later, in March

21

or April 2018, Hester filed a formal disciplinary action against the student who physically assaulted him. Hester therefore has properly alleged that he engaged in a protected activity. *See* 42 U.S.C. § 2000e-3; *Laughlin*, 149 F.3d at 259.

### 2.   Materially Adverse Action

Hester has also properly alleged that after the protected activity, he was the subject of materially adverse actions. A "materially adverse" action is one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). An action taken against a plaintiff may be "materially adverse" even if it did not result in a loss of compensation, job title, level of responsibility, or opportunity for promotion. *Id.* at 67 (rejecting the standard limiting actionable retaliation to "so-called ultimate employment decisions"). In particular, Hester has alleged that the BOE took materially adverse actions when (1) on several occasions, the BOE failed to investigate or respond to Hester's complaints and (2) in June 2018, the BOE terminated Hester's employment. With respect to Hester's first contention, a failure to respond to complaints of harassment and discrimination generally does not constitute a materially adverse action. *See Cooper v. Smithfield Packing Co., Inc.*, 724 F. App'x 197, 202 (4th Cir. 2018). However, the BOE's termination of Hester's employment is certainly a materially adverse action. *Strothers*, 895 F.3d at 328 (finding that it is "patently obvious and undisputed" that termination is a materially adverse action).

### 3.   Causation

As for causation, the BOE argues that there are insufficient allegations to show a causal connection between the protected activity and the materially adverse action. However, at the pleading stage, causation in a retaliation claim can be inferred based on the temporal proximity

between the protected activity and retaliatory action. *See King v. Rumsfeld*, 328 F.3d 145, 151 & n.5 (4th Cir. 2003) (concluding that ten weeks between the protected activity and the materially adverse action gave "rise to a sufficient inference of causation to satisfy the prima facie requirement"). Moreover, a lengthy period of time between a plaintiff's protected activity and the materially adverse action may not be dispositive where the employer retaliates upon its first "opportunity to do so." *See Templeton v. First Tenn. Bank, N.A.*, 424 F. App'x 249, 251 (4th Cir. 2011) (finding at the motion to dismiss stage that where the plaintiff alleged that she had resigned shortly after complaining of harassment, a causal connection could plausibly be inferred despite the passage of time because her re-application two years later presented the first chance for her employer to retaliate).

Hester submitted a complaint to the PGCPS Office of Equity Assurance on February 22, 2018. Hester's termination occurred on June 30, 2018, approximately four months after the submission of his formal complaint, which is sufficiently close in time to support a claim of causation at this early stage. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (noting that the Fourth Circuit has found a causal connection between a plaintiff's protected activity and her discharge where the employer fired the plaintiff approximately four months after the complaint was filed) (citing *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 454, 457 (4th Cir. 1989)). Furthermore, viewing the allegations in the light most favorable to Hester, as is required at this stage, the BOE arguably terminated Hester's employment at its first "opportunity to do so"—the end of the academic year. *Templeton*, 424 F. App'x at 251. Thus, Hester has pleaded sufficiently that there was a causal connection between the protected activity and materially adverse action. To the extent that the stated reason for Hester's termination was the expiration of his teaching certificate, he has alleged that this reason was pretextual, and that the termination was thus

23

retaliatory, because other teachers in the same situation have been permitted to stay on as a long-term substitute teacher, but he was not. The Court therefore finds that at this early stage, Hester has stated a valid claim of retaliation.

## CONCLUSION

For the foregoing reasons, the BOE's Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to (1) the claims of a hostile work environment based on religion, race, and national origin; and (2) the claims of retaliation based on the BOE's failure to investigate Hester's complaints of harassment and those based on any allegedly retaliatory acts occurring before January 3, 2018. The Motion will otherwise be denied. A separate Order shall issue.

Date:   October 12, 2022

THEODORE D. CHUANG
United States District Judge

24